# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

STEVEN TROBAUGH,

        Plaintiff,

vs.

NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration,

        Defendant.

7:17-CV-5004

MEMORANDUM AND ORDER

This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Steven Trobaugh's disability insurance benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq*. and § 1381 *et seq*. The Court has considered the parties' filings and the administrative record, and affirms the Commissioner's decision to deny benefits.

## I. PROCEDURAL HISTORY

Trobaugh filed applications for disability insurance benefits and supplemental security income in February 2014. Trobaugh's claims were denied initially (T101-104) and on reconsideration (T113-115). Following a hearing, an administrative law judge (ALJ) determined that Trobaugh was not disabled under the Social Security Act, and therefore not entitled to disability benefits. T21. The ALJ determined that, although Trobaugh suffers from severe impairments, he has the residual functional capacity to perform other jobs that exist in significant numbers in the national economy. T11-T21. The Appeals Council of the Social Security Administration (SSA) denied

Trobaugh's request for review of the ALJ's decision. T1-5. Trobaugh's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g). Filing 1.

## II. FACTUAL BACKGROUND
### 1. MEDICAL HISTORY

Trobaugh's medical records reflect a history of physical impairments and, to a lesser extent, psychological limitations. For the purposes of this appeal, that history began in 2013, when Trobaugh visited Dr. Chris Wilkinson, an orthopedic specialist, with complaints of "bilateral shoulder pain from a motor vehicle accident in 2011." T267. Based on those complaints, and Trobaugh's medical history more generally, Wilkinson scheduled an arthroscopy of Trobaugh's right shoulder "with an open repair of the greater tuberosity[.]" T263.

Notes from that procedure reflect Trobaugh's relative good health: one practitioner described him as a "well-developed, well-nourished 43-year-old male in no acute distress." T329. But the notes also describe Trobaugh's persistent shoulder pain, which "limit[s his] range of motion." T328. That pain, the arthroscopy revealed, was due in part to a superior labral tear, which doctors presumably repaired during the procedure. *See* T308.

Trobaugh filed his claim for benefits immediately following the arthroscopy, listing "Left and Right shoulders broken" as a disabling condition. T74. Trobaugh also listed: chronic obstructive pulmonary disease (COPD), lung disease, depression, bipolar disorder, and "Neck and back problems." T189. The SSA, however, determined that Trobaugh's medical records were insufficient to support a decision on his claim. T77. So, Trobaugh was required to undergo additional consultative examinations with Tamara Johnson, M.D., and Rebecca Schroeder, Ph.D. T270; T279.

Johnson's examination focused primarily on Trobaugh's physical capabilities. She observed that Trobaugh could "sit, stand and walk unassisted" and could "handle objects with both gross and fine manual motor dexterity." T277. But she also noted "definite weak[ness]" in Trobaugh's upper extremities and "extremely limited" range of motion in his shoulders. T277. As to his psychological condition, Johnson described Trobaugh as both "alert and oriented" and "depressed [and] lethargic." *See* T272; T277.

Schroeder performed a psychological evaluation of Trobaugh. T279. Results from that evaluation are, for the most part, consistent with Johnson's observations: that Trobaugh suffers from depression, is often "low energy," and rarely leaves his home. T281-282. Schroeder opined that Trobaugh's depression and overall affect may result in "mild limitations" in his day, including "issues relating to coworkers and supervisors." T283. But, she noted, Trobaugh is "capable of sustaining concentration and attention needed for at least a short task." T284. Schroeder assigned Trobaugh a global assessment of functioning (GAF) score of 60.[1]

The record contains other medical records, too, that are relevant to Trobaugh's claim. For example, two state agency medical consultants—Jerry Reed, M.D., and Steve Higgins, M.D.—reviewed Trobaugh's medical records. *See* T74; T87. Reed determined that Trobaugh's conditions do, in some respects, limit his ability to work. But overall, he said, "[w]e have determined

---

[1] A GAF is "the clinician's judgment of the individual's overall level of functioning," not including impairments due to physical or environmental limitations. *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000). A GAF score of 51-60 indicates moderate symptoms including flat affect and circumstantial speech; or moderate difficulty in social, occupational, or school functioning.

that your condition is not severe enough to keep you from working." T85. Higgins reached the same result on reconsideration. *See* T97.

Also, in October 2014, Trobaugh visited Wilkinson (the doctor who arranged the initial arthroscopy) regarding continued pain in his left shoulder. T314. After examining the shoulder, and at Trobaugh's request, Wilkinson issued Trobaugh a note saying that he was "unable to work because of . . . chronic shoulder problems." T314. Trobaugh needed the note, he said, for a legal dispute regarding unpaid child support. T314.

### 2. Hearing Testimony

At the administrative hearing, Trobaugh testified to his medical condition and symptoms, which generally mirror the symptoms discussed above. He explained, for example, the pain he experiences in his shoulders and back, and the limitations associated with that pain. T46-47. He also described his diagnoses for COPD and emphysema, and past surgical operations on both lungs. T49-50. And he discussed his general battle with depression, saying that he feels depressed "[a]ll the time." T51. These conditions, Trobaugh testified, limit his ability to stand for long periods of time, lift heavy objects, and meaningfully interact with other people. T54-58.

The ALJ then questioned Trobaugh about his physical capabilities and work history. Trobaugh responded with details of his past work experience as a construction worker and roofer—jobs which, Trobaugh said, he can no longer perform because of his shoulder pain. *See* T59-61.

The ALJ presented the vocational expert (VE) with a hypothetical based on a worker "who has no past relevant work" and who

> is able to perform work that does not require overhead reaching; [must] avoid extreme and concentrated temperatures, humidity,

fumes and dust; able to perform work that is not exposed to hazards such as work at unprotected heights; able to perform work that is simple and to respond appropriately to routine changes in the work environment; able to perform work that does not require more than incidental and superficial contact with the public; and does not require working in tandem or close coordination with others.

T67. Such a person, the VE opined, could perform sedentary, unskilled work, such as a document preparer or eyeglass frame polisher. T68. The ALJ then asked the VE to assume, in addition to the conditions described above, that the individual was limited in his ability to reach "in other planes and other directions." T68. With that addition, the VE opined that the claimant would be unable to sustain work. T68.

### 3. SEQUENTIAL ANALYSIS AND ALJ FINDINGS

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).

#### (a) Step One

At the first step, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); 20 C.F.R. § 404.1520(a)(4)(i). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(i).

In this case, the ALJ found that Trobaugh had not engaged in substantial gainful activity since his alleged disability onset date, and that finding is not disputed on appeal. T13.

(b) Steps Two and Three

At the second step, the claimant has the burden to prove he has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 404.1520(a)(4)(ii), in that it "significantly limits his physical or mental ability to perform basic work activities." *Gonzales*, 465 F.3d at 894; *see also Kirby v. Astrue,* 500 F.3d 705, 707–08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

In this case, at step 2, the ALJ found that Trobaugh had the following severe impairments: degenerative joint disease of the shoulders bilaterally with residuals of surgery; history of compression fracture in the spine; COPD with residuals of lung surgery; mood disorder; personality disorder; organic brain disorder; and degenerative joint disease of the left knee. T13. At step three, however, the ALJ found that Trobaugh did not have an impairment or combination of impairments that met or medically equaled a listed impairment. T13-15. Trobaugh does not dispute this finding on appeal.

(c) Residual Functional Capacity

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is then used at steps four and five. 20 C.F.R. § 404.1520(a)(4). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found

to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

To determine a claimant's RFC, the ALJ must consider the impact of all the claimant's medically determinable impairments, even those previously found to not be severe, and their related symptoms, including pain. 20 C.F.R. §§ 404.1529(d)(4) and 404.1545(a)(1) and (2). This requires a review of "all the relevant evidence" in the case record. 20 C.F.R. § 404.1545(a). Although the ALJ is responsible for developing the claimant's complete medical history, 20 C.F.R. § 404.1545(a)(3), the claimant bears the burden of proof to demonstrate his or her RFC. *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will consider "statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations," as well as descriptions and observations of the claimant's limitations caused by his impairments, including limitations resulting from symptoms, provided by the claimant or other persons. 20 C.F.R. § 404.1545(a)(3).

The RFC assesses the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(4). The mental requirements of work include, among other things, the ability: to understand, remember, and carry out instructions; to respond appropriately to supervision, coworkers, and work pressures in a work setting; to use judgment in making work-related decisions; and to deal with changes in a routine work setting. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); SSR 96-8p, 61 Fed. Reg. 34474-01, 34477 (July 2, 1996). An RFC must assess the claimant's ability to meet the mental requirements of work, 20 C.F.R. § 404.1545(a)(4), which includes the ability to respond appropriately to coworkers and work pressures. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c);

SSR 96-8p, 61 Fed. Reg. at 34477. The RFC must include all limits on work-related activities resulting from a claimant's mental impairments. SSR 85-16, 1985 WL 56855, at *2 (1985).

A special procedure governs how the ALJ evaluates a claimant's symptoms. The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(a) to (c)(1). A medically determinable impairment must be demonstrated by medical signs or laboratory evidence. 20 C.F.R. § 404.1529(b). If this step is satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1). This again requires the ALJ to review all available evidence, including statements by the claimant, "objective medical evidence,"[2] and "other evidence."[3] 20 C.F.R. § 404.1529(c)(1) to (3). The ALJ then considers the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, and evaluates them in relation to the objective medical evidence and other evidence. § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id*.; § 404.1529(d)(4).

---

[2] 20 C.F.R. §§ 404.1529(c)(2) and 404.1528(b) and (c).

[3] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. *See* 20 C.F.R. § 404.1529(a) (and sections referred to therein); *see also* 20 C.F.R. § 404.1529(c)(3).

In assessing the credibility of a claimant's subjective testimony regarding his or her alleged symptoms, the ALJ must weigh a number of factors. *See, Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009); 20 C.F.R. § 404.1529(c)(3)(i–vii).[4] When deciding how much weight to afford the opinions of treating sources and other medical opinions regarding a claimant's impairments or symptoms, the ALJ considers a number of factors set forth in 20 C.F.R. § 404.1527.

The ALJ developed the following RFC for Trobaugh:

> [Trobaugh has the] residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant is able to perform work that does not require overhead reaching; he must avoid extreme and concentrated temperatures, humidity, fumes, and dusts; and he is able to perform work that does not expose him to hazards such as work at unprotected heights. Further, he is able to perform work that is simple; he is able to respond appropriately to routine changes in the work environment; and he is able to perform work that does not require more than incidental and superficial contact with the public and does not require working in tandem or in close coordination with others.

T15.

---

[4] In assessing a claimant's credibility, the ALJ should consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore,* 572 F.3d at 524.

As is common in these cases, the ALJ found that Trobaugh's medically determinable impairments could reasonably be expected to cause the alleged symptoms; but that Trobaugh's statements "concerning the intensity, persistence and limiting effects of these symptoms are not persuasive to the extent they are inconsistent with" the ALJ's RFC assessment. T19. On this point, the ALJ observed that despite complaints of severe and constant pain, Trobaugh "takes his prescribed narcotic pain medication only 'occasionally.'" T17. Further, while Trobaugh "gave the impression" that he was unable to use his arms, "there is no evidence in the record to support such extreme subjective complaints[.]" T17. And despite allegations of disabling anti-social behavior, Trobaugh "engages in socializing" and is generally described as "pleasant and cooperative." T17.

In determining Trobaugh's RFC, the ALJ gave "great weight" to Schroeder's 2014 psychological examination. T17-18. Specifically, the ALJ credited Schroeder's finding that, despite signs and symptoms of depression, Trobaugh "would be capable of sustaining concentration and attention needed for [] short task completion." T18.

The ALJ gave little weight, however, to Wilkinson's note regarding Trobaugh's alleged inability to work (which Wilkinson wrote in connection with unpaid child support). T19. That "bare conclusion," the ALJ wrote, "does not include an opinion about [Trobaugh's] functional limits" and is a conclusion generally reserved to the Commissioner. T19. The ALJ provided "some weight" to state agency physicians Reed and Higgins. *See* T19.

(d) Steps Four and Five

At step four, the claimant has the burden to prove that he lacks the RFC to perform his past relevant work. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still do his past relevant work, he will

be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(v).

Here, the ALJ found that Trobaugh had no past relevant work, and therefore proceeded to step five. T20. At that stage, based on the testimony of the vocational expert, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Trobaugh could perform. T20. So, the ALJ concluded that Trobaugh was not under a disability, and denied his claims for benefits. T21.

### III. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id.* The Court must consider evidence that both supports and detracts from the ALJ's decision, but will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.* The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir.

2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue,* 652 F.3d 860, 863 (8th Cir. 2011).

## IV. ANALYSIS

Trobaugh argues that the ALJ, in denying his claim for benefits, erred in three material respects. First, Trobaugh argues that the ALJ's findings regarding his RFC are not supported by substantial evidence. Filing 19 at 1. Next, Trobaugh contends that the ALJ erred in failing to incorporate all of his documented limitations and conditions into the hypothetical question posed to the VE, and then failed to resolve conflicts between the VE's testimony and the Dictionary of Occupational Titles. Filing 19 at 13. And finally, Trobaugh argues that the ALJ failed to expressly find and determine that he is illiterate. Filing 19 at 1.

### 1. DETERMINATION OF RFC

As noted above, the RFC is what a claimant can still do despite his physical or mental limitations. *See* 20 C.F.R. § 416.945(a). The ALJ bears the primary responsibility for determining a claimant's RFC and, because the RFC is a medical question, some medical evidence must support the ALJ's determination. *Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir. 2010). In determining the RFC, the ALJ must consider all evidence in the record, including medical records and observations of treating physicians. *See Stormo v. Barnhart,* 377 F.3d 801, 807 (8th Cir. 2004).

Trobaugh argues that the ALJ erred in concluding that he possessed the physical and mental functional capacity to perform sedentary work with specific limitations. *See* filing 19 at 8-12. Accordingly, Trobaugh seeks reversal of the Commissioner's decision and remand for a new hearing. Filing 19 at 18.

(a) Physical Capabilities

The ALJ determined that Trobaugh possessed the physical functional ability to perform sedentary work as defined in 20 C.F.R. § 416.967(a). T15. Trobaugh argues that the determination is erroneous because the ALJ, in crafting the RFC, did not rely on the "best" available evidence. Filing 19 at 9.

Trobaugh's argument relates to the additional consultative examinations that the SSA required before processing his claim. As noted above, the SSA informed Trobaugh that his medical records were insufficient to support a decision, and that he was required to visit Dr. Tamara Johnson for a physical examination. T270. According to Trobaugh, that examination should have been arranged through Dr. Wilkinson, as opposed to Dr. Johnson, because Wilkinson "had been [Trobaugh's] primary physician and orthopedic surgeon." Filing 19 at 9. Because it was not, Trobaugh argues that the RFC is erroneous and unreliable. *See* filing 19 at 8.

It is true, as Trobaugh point out, that treating physicians are the "preferred source" for additional examinations like the one at issue here. 20 C.F.R. § 416.919h. But they are not a required source. *See Janes v. Colvin*, No. 6:15-CV-1518, 2017 WL 972110, at *7 (N.D.N.Y. March 10, 2017). And in any event, the SSA specifically asked Wilkinson in an April 2014 letter if he'd be willing "to perform an evaluation [of Trobaugh] to provide additional findings[.]" T269. Wilkinson did not respond to that letter, which specifically advised him that "[n]ot responding . . . or not returning [this questionnaire] will be interpreted as a no." T269. The SSA was reasonable in believing that Wilkinson was unwilling to perform the evaluation, and Trobaugh's motion to reverse on these grounds will be denied.

Trobaugh also argues that the ALJ erred in failing to specifically discuss the limitations addressed in Johnson's evaluation (*i.e.*, shoulder pain,

- 13 -

signs of depression, and inability to carry light objects). But no such requirement exists under governing regulations. Rather, the ALJ is required to explain a particular medical opinion only when it expressly conflicts with the RFC. SSR 96-8p, 1996 WL 374184, at *7 (S.S.A. July 2, 1996). And as the Commissioner correctly points out, there are no such conflicts here. Indeed, the RFC specifically prohibits overhead reaching; limits contact with humidity, fumes and dusts; and provides for only "incidental and superficial" contact with the public. *See* T15. Those conditions are consistent with Johnson's findings regarding weakness in Trobaugh's upper extremities, "evidence of emphysema," and depression. *Compare* T277, *with* T15.

(b) Mental Capabilities

Trobaugh makes similar arguments regarding the ALJ's determination of his mental functional capacity. *See* filing 19 at 12. To that end, Trobaugh suggests that the RFC does not account for certain limitations reflected in Schroeder's psychological evaluation, including his speech impediment and need for "more than ordinary supervision." Filing 19 at 13.

But as noted throughout, the RFC *does* account for those limitations. The RFC specifies "simple" occupations that require no more than incidental and superficial contact with the public, and which "do[] not require working in tandem or in close coordination with others." T15. It also accounts for the attributes described in Schroeder's report, including Trobaugh's "good" communication skills, his "well-oriented" demeanor, and his ability to answer simple questions. T282-284.

In sum, after careful review of the record, the Court finds that the RFC is supported by substantial evidence. Accordingly, Trobaugh's motion to reverse the Commissioner's decision on those grounds will be denied.

(c) The VE's hypothetical

Trobaugh challenges the hypothetical posed to the VE on two separate, yet related grounds. First, Trobaugh argues that the hypothetical question did not include all of his impairments and limitations. Filing 19 at 13. But that argument derives entirely from the issue considered, and rejected, above. In other words, Trobaugh contends that because the RFC was inadequate, so too was the hypothetical question (which essentially mirrors the RFC). The Court has already determined that the RFC was not deficient, so it need not address Trobaugh's related argument here.

Trobaugh also argues, however, that the ALJ failed to resolve an apparent conflict between the physical limitations described in the hypothetical question, and the requirements of the jobs the VE identified as listed in the Dictionary of Occupational Titles ("DOT").

The hypothetical question posed to the VE in this case did not, at least initially, include any limitations regarding Trobaugh's ability (or inability) to read and write. But immediately after the ALJ's hypothetical question was posed to the VE, the following exchange occurred:

ALJ: [poses the hypothetical question]

VE: And Your Honor, do I take into account his educational limit?

ALJ: Well, to the extent that it affects anything. Would it affect anything, I mean –

VE: Yes, it would.

. . .

> ALJ: Okay. Well, would there be any simple occupations where one would not need to read or write novel information and I'm assuming a person could read simple instructions and read enough to understand, you know, warning signs and things like that? Would there be any [jobs] where reading and writing is not really integral or you know, essentially part of that job task?
>
> VE: I believe document preparer [and eyeglass frame polisher].

T67-68.

The two jobs identified by the VE are in conflict with the ALJ's amended hypothetical, Trobaugh argues, because both jobs require some degree of reading and writing comprehension. *See* filing 19 at 14-15. For example, the DOT lists a "document preparer" at language level 2, meaning the individual should be able to read 190 to 215 words per minute. Filing 19 at 14; DOT #249.587-018. And an eyeglass frame polisher is a language level 1, requiring 95 to 120 words per minute. Filing 19 at 15; DOT #713.684-038. According to Trobaugh, both requirements are inconsistent with the ALJ's directive that "reading and writing is not really integral or . . . essentially part of the job task[.]" Filing 19 at 16.

Under governing regulations, an ALJ must ask about any possible conflict between VE evidence and information provided in the DOT. SSR 00-4p. In this case, the ALJ satisfied this requirement by asking the VE to confirm the consistency of her testimony. T66. However, if there is an "apparent unresolved conflict" between VE testimony and the DOT, the ALJ must also "elicit a reasonable explanation for the conflict" and "resolve the conflict by determining if the explanation given by the expert provides a basis for relying on the VE testimony rather than on the DOT information." *Moore*

*v. Colvin*, 769 F.3d 987, 989-90 (8th Cir. 2014) (cleaned up). It is that requirement that Trobaugh relies on here.

The Court agrees with Trobaugh that the ALJ could have been clearer in articulating—at the outset—the particular limitations associated with the hypothetical. But the Court does not agree that there was an "apparent unresolved conflict" that required resolution. Indeed, much of Trobaugh's argument on this point is premised on the assumption that he is completely illiterate. *See* filing 19 at 14. But that conclusion appears nowhere in the record, and the ALJ never expressly adopted that finding in the RFC or elsewhere. Rather, the ALJ's hypothetical assumed limited reading comprehension abilities, which is consistent with Trobaugh's own testimony. *Compare* T44, *with* T67-68. Simply put, the Court cannot say, on this record, that the limitations described by the ALJ conflict with the jobs identified by the VE. Accordingly, Trobaugh's motion to reverse on these grounds will be denied.

### (d) Illiteracy

Trobaugh's final argument also pertains to his alleged illiteracy. To that end, Trobaugh contends that the ALJ "failed to expressly find and determine that [Trobaugh] is illiterate and that a decision of disabled" is mandated by the Medical Vocational Guidelines. Filing 19 at 16.

At step 5, in making a final determination as to disability, an ALJ first looks to the Tables or "grids" set forth in Appendix 2 to Subpart P. *See Howard v. Massanari*, 255 F.3d 577, 583 (8th Cir. 2001). Relevant here, Rule 201.17 requires a finding of disabled if the claimant is between the age of 45 and 49, is limited to sedentary work, and is illiterate. Trobaugh, who was 45 at the time of the ALJ's decision and is limited to sedentary work, claims that he is illiterate, and thus disabled under the grids. *See* filing 19 at 17.

The ALJ did not make an explicit finding regarding literacy (perhaps because it was not listed as a basis for Trobaugh's initial application). Rather, the ALJ, in cursory fashion, cites Rule 201.18, which pertain to individuals with "limited" education and who are "at least literate and able to communicate in English." The Court agrees with Trobaugh that the ALJ could have developed a stronger record on this point. But "the ALJ's failure to develop more robust proof of literacy (or illiteracy) is not fatal to the Commissioner's decision." *Howard*, 255 F.3d at 584. And that is particularly true here where Trobaugh (1) passed a driver's exam, *see id.* (such exams "ostensibly require[] an applicant to complete a written exam"); (2) marked on his application for benefits that he could read and understand English, and write "more than [his] name," T188; and (3) testified at the administrative hearing that he could read and understand "some" of the briefs and materials submitted with his claim, T44.

In sum, the administrative record contains evidence pointing to Trobaugh's ability to read (albeit a limited ability). Given the deferential standard of review, the Court deems the evidence sufficient to support the ALJ's conclusion that Trobaugh is functionally literate. *See Howard*, 255 F.3d at 585. Therefore, the ALJ's "not disabled" determination will be affirmed. *See* T20.

## CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ did not err in any of the ways asserted by Trobaugh. The Court therefore concludes that the Commissioner's decision was supported by substantial evidence and should be affirmed.

IT IS ORDERED:

1. The Commissioner's decision is affirmed.

2. Trobaugh's complaint is dismissed.

3. The parties shall bear their own costs.

4. A separate judgment will be entered.

Dated this 23rd day of July, 2018.

BY THE COURT:

John M. Gerrard
United States District Judge